**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GILBERT MORENO and ANGELA MORENO,<br><br>                              Plaintiff,<br><br>   vs.<br><br>USG CORPORATION, et al.,<br><br>                              Defendants. | CASE NO. 06cv2196 DMS (PCL)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT ALSTOM POWER, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. 84] |

Pending before the Court is Defendant Alstom Power, Inc.'s ("Defendant" or "Alstom Power") motion for summary judgment. Plaintiff opposed the motion and Defendant replied. On June 20, 2008, the Court heard oral argument. Thomas Friedberg appeared for Plaintiff, and Robert Scherk for Defendant. The motion is granted in part and denied in part for the reasons set forth below.

**I.**

**BACKGROUND**

Plaintiff was an employee of United States Gypsum Company (USG) when he was injured while working on the No. 1 Board Line at USG's Plaster City facility. (Mot. at 1). The No. 1 Board Line is used in the manufacture of drywall, also known as gypsum board or wallboard. Plaintiff was injured while cleaning a pulley that drives a conveyor belt, which is part of the board forming line.

The board forming line was manufactured by Combustion Engineering, Inc. in 1985 through

1  its C-E Raymond/Ehrsam divisions (CE Raymond). It was then sold to Windsor Gypsum in
2  Henderson, Texas. (Mot. at 2). In approximately 1992, USG acquired the board forming line from
3  Windsor Gypsum. (*Id*).

4        In 1990, Combustion Engineering was acquired by Asea, Brown, Boveri (ABB). In 1999, ABB
5  and Alstom Power entered into a joint venture with respect to their power generation and gas turbine
6  businesses. In 2000, Alstom Power acquired ABB's 50-percent interest in the joint power
7  generation/gas turbine business. (Mot. at 3). In 2003, a plaintiff in Florida filed a lawsuit against
8  Alstom Power alleging a defect in the same conveyor system at issue in this case. *Donovan Cheng v.*
9  *Alstom Power, Inc.*, Case No. 03-20382-CIV-SEITZ. In Alstom Power's answer to the complaint in
10 *Cheng*, Alstom Power admitted the conveyor system business of C-E Raymond was "taken or [sic] by
11 and/or merged with Alstom Power, Inc." and the "liability of CE Raymond Engineering related to its
12 conveyor system business was assumed by Alstom Power, Inc." (Exh. 2-3 to Request for Judicial
13 Notice).

14       Plaintiff's claims against Alstom Power are "based on the defective design of the gypsum board
15 forming line that caused" Plaintiff's injury. (Opp. at 1). In particular, Plaintiff alleges the design was
16 defective because Alstom Power's predecessor in interest failed to install an interlocking device on
17 the guard blocking access to the pulley on which Plaintiff was injured. As defined by Plaintiff, an
18 interlocking device is a safety feature that automatically de-energizes the line when the guard is
19 removed from the area it protects.

20       The board-forming line originally was designed and manufactured with a guard bolted to the
21 machine, which prevented access to the pulley on which Plaintiff was injured. (Opp. at 5). When the
22 machine was sold to USG, it was disassembled for transport and reassembled in Plaster City. (P's
23 Supp. at 4). At some point before Plaintiff's accident, USG mechanics removed the original guard and
24 replaced it with a new guard that covered a much larger area. The new guard also was not designed
25 with an interlocking device. (Opp. at 6). Plaintiff's mechanical engineering expert, John Manning,
26 opines that due to its larger size, when bolted in place, the new guard provided better protection for
27 workers than the original guard. (*Id.*) However, at the time of the accident, the new guard was not
28 bolted to the board forming line. (Plaintiff's Deposition, p. 100:10-101:8, D's Exh. A.) According to

Plaintiff's testimony, it had not been attached for approximately eight months. Because it was unattached, it could be slid away from the pulley by one person. (*Id.*)

Defendant argues it is entitled to summary judgment, or, in the alternative, partial summary judgment because (1) Defendant cannot be liable under a successor theory; (2) Plaintiff Gilbert Moreno cannot demonstrate that the lack of an interlocking mechanism on the original guard was the legal cause of his injuries; (3) Plaintiff Angela Moreno's cause of action for loss of consortium has no merit; and (4) Plaintiff lacks clear and convincing evidence of malice or oppression to support an award of punitive damages. The motion was briefed, and the Court heard oral argument on June 20, 2008. At oral argument, Plaintiff represented that he possessed certain audit reports that would create a question of fact with respect to the issue of causation. The Court allowed Plaintiff to supplement the record with the audit reports, and Defendant replied. After carefully reviewing the record and argument of the parties, including Plaintiff's newly-presented evidence and Defendant's response, summary judgment is granted in favor of Defendant on the strict liability claim and prayer for punitive damages, but denied on the negligence and loss of consortium claims.

## II.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where there is an absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett,* 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When making its determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *See Matsushita,* 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. The Court has jurisdiction over this matter due to the diversity

of citizenship of the parties pursuant to 28 U.S.C. § 1332. Accordingly, the Court applies the substantive law of California.

## III.

## DISCUSSION

Plaintiff alleges the board forming line was defective because Defendant's predecessor in interest failed to install an interlocking device on the guard blocking employees' access to the conveyor belt pulleys. Plaintiff asserts three claims against Alstom Power, which is alleged to be the successor in interest of the original manufacturer: (1) strict products liability, (2) negligence, and (3) loss of consortium. Plaintiff also seeks punitive damages as part of his strict products liability claim.

As a threshold matter, questions of fact remain with respect to whether Defendant Alstom Power may be held liable as a successor. In particular, the Court cannot determine as a matter of law whether (1) Alstom Power assumed the liabilities of its successor, (2) the transaction between Alstom Power and ABB "amounts to a consolidation or merger of the two corporations," or (3) "the purchasing corporation is a mere continuation of the seller." *See Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977). Plaintiff presents evidence that in the course of a prior lawsuit, Alstom Power admitted it assumed liability for CE Raymond's conveyor system business. The Court declines to decide whether this admission has issue preclusive effect in the instant lawsuit, but instead notes that it creates a question of fact with respect to Alstom Power's exposure to successor liability. The Court now addresses Plaintiff's substantive claims in turn.

*1.     Strict Products Liability*

A manufacturer of a product may be held strictly liable for injuries caused by a product defect. A product is defective if any of the following circumstances exist at the time of sale or distribution: (1) the product contains a manufacturing defect, which means it departs from its intended design; (2) the product "contains a design defect," which means the "forseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design;" or (3) the product "is defective because of inadequate instructions or warnings." Rest. 3d Torts: Products Liability §2 (a), (b), and (c). In the instant case, Plaintiff has alleged a design defect, namely, that the original guard on the conveyor belt was not designed with an interlocking device that automatically

de-energizes the conveyor pulley motor when the guard is displaced.

However, Plaintiff does not allege, or attempt to prove, that the originally-designed guard failed to protect Plaintiff. Instead, Plaintiff's expert testified that the original guard, when bolted in place, provided sufficient protection for workers in Plaintiffs' position. (Manning Decl. ¶ 8). Plaintiff nonetheless argues that the manufacturer of the guard should have known pulley guards frequently are un-bolted, and therefore should have designed the guard with an interlock. However, Plaintiff concedes that the original guard was *replaced* before he was injured. Plaintiff therefore argues that "had the original guarding been interlocked, it is more probable than not that the new guarding would have been adapted by [USG] mechanics to utilize the original interlocking mechanism or that a substitute of equal or better function would have been used." (Manning Decl. ¶ 5). From there, the Court is invited to infer that if the new guarding had been designed to adapt an interlocking device that remained intact and functional until the time of Plaintiff's accident, Plaintiff would not have been injured. (See Compl. ¶ 44, alleging causation). Even assuming Plaintiff can prove each link in this alleged chain of causation, summary judgment on the strict liability claim is appropriate because there is no evidence the original design was defective in a way that caused Plaintiff's injuries.

"A product is defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; or (2) if the benefits of the challenged design do not outweigh the risk of danger inherent in such design." *Barker v. Lull Engineering Co.*, 20 Cal. 3d 413, 418 (1978). Plaintiff fails to identify a cognizable defect in the guard that existed at the time of manufacture and caused his injury. The original guard did not fail to protect Plaintiff; it was no longer in use when Plaintiff was injured. In addition, it is undisputed that when Plaintiff's employer removed the original guard and replaced it with a new one, *any* interlock device originally installed would have been rendered inoperable unless USG *adapted* the hypothetical existing interlock device or substituted a new one. (Mot. at 6, Opp. at 12, P's Supp. at 7). Thus, the only defect in CE Raymond's design that Plaintiff identifies is its failure to adequately inspire USG to outfit its replacement guard with a new or adapted interlock device. (Manning Decl. ¶ 5). However, Plaintiff presents no evidence or legal authority supporting the position that "an ordinary consumer would expect" the original design to serve an inspirational function or that failure

to inspire safe redesigns is a "danger inherent" in a guard without an interlock. *See Barker,* 20 Cal. 3d at 418. Accordingly, Plaintiff presents no evidence that the product was "defective when manufactured or sold." *See Erickson v. Sears, Roebuck & Co.*, 240 Cal. App. 2d 793, 798 (1966).

Even if the Court were to find Defendant's failure to install an interlocking could be a design defect, the causation element of Plaintiff's strict liability claim requires that the product "reach the user or consumer without substantial change in the condition in which it is sold." *See, e.g. Putensen v. Clay Adams, Inc.*, 12 Cal. App. 3d 1062, 1073 (1970) (upholding summary judgment when, it was "clear" that the product had "reached plaintiff after it had undergone a substantial change in the condition in which it was sold," and it was "equally as probable" that the defect was caused by the change). When Plaintiff was injured, the machine had been substantially altered– the guard had been replaced, which would have rendered any interlock device inoperable– and the new guard had been un-bolted from the machine.

Plaintiff argues the testimony of a CE Raymond engineer sufficiently raises a question of fact concerning whether the manufacturer could foresee that its product would be altered by removing the guards. Although Plaintiff presents evidence that CE Raymond knew conveyors frequently were used without guards, he presents no evidence that the manufacturer was aware the entire guarding mechanism would be redesigned and replaced. Accordingly, there is no evidence that Defendant did or should have anticipated USG's substantial change to the board line. Accordingly, summary judgment is granted with respect to Plaintiff's strict liability claim.[1]

    *2.    Negligence*

Even if a product undergoes substantial changes before reaching the consumer, a manufacturer nonetheless may be held liable under a negligence theory. *Putensen v. Clay Adams, Inc.*, 12 Cal. App. 3d 1062, 1078 (1970). Plaintiff must prove Defendant's breach of duty was the proximate or legal cause of Plaintiff's alleged injury. Rest. 2d Torts § 430. In support of his negligence claim, Plaintiff presents the opinion testimony of engineering expert John Manning. Relying upon his review of certain internal safety audit reports generated by USG, Manning's declaration sets forth his opinion that "had

---

[1] Because Plaintiff's prayer for punitive damages arises out of his strict liability claim, the dismissal of that claim results in dismissal of Plaintiff's request for punitive damages.

the original guarding been interlocked, it is more probable than not that the new guarding would have been adapted by [USG] mechanics to utilize the original interlocking mechanism or that a substitute of equal or better function would have been used." (Manning Decl. ¶ 5). Manning reached this conclusion through the following steps: First, he used his expertise in engineering to determine an efficient design for an interlocking mechanism that would have fit the original guard. From there, he speculates that if C-E Raymond had installed an interlocking mechanism, it would have adopted Manning's proposed design. Given the presence of the proposed design on the guard, Manning used his expertise to determine that it would have been easy and inexpensive to design the new guards with an interlocking mechanism or adapt the existing interlocking device to function with the new guards. (Opp. at 12). From his review of the audit reports indicating USG generally maintained existing safety features, Manning then opined that if the original design had been designed with an interlocking mechanism, the USG mechanics would have fit the new guards with an interlocking mechanism, which Manning believes would have prevented Plaintiff's injury. (*Id*).

After oral argument, with the Court's permission, Plaintiff supplemented Manning's testimony with further depositions and audit reports that tend to support each link in the causal chain described above. Construing all such evidence in the light most favorable to Plaintiff, the Court finds Plaintiff presented sufficient evidence to create a material question of fact with respect to whether Defendant's conduct was a cause of Plaintiff's injury.[2] Remaining questions regarding causation include but are not limited to (1) whether the removal of the original guard was foreseeable, and (2) whether Defendant's original design would have inspired an adequate redesign of the guarding mechanism that would have protected Plaintiff.

## IV.

## CONCLUSION

For these reasons, Defendant's motion for summary judgment is granted with respect to the strict liability claim and the claim for punitive damages, but denied with respect to the claims for

---

[2] Because the issue of duty was not briefed or argued, the Court does not consider whether Defendant owed a duty to Plaintiff to design its product in a way that would have inspired USG to affix an adapted and properly functioning interlock device to the new guard.

1 | negligence and loss of consortium.[3]

2 | **IT IS SO ORDERED**.

4 | DATED: July 22, 2008

```
                                          _____
                                          HON. DANA M. SABRAW
                                          United States District Judge
```

---

[3] Summary judgment is denied with respect to the loss of consortium claim to the extent that the claim arises out of Defendant's alleged negligence, but granted to the extent that it arises out of Plaintiff's claim for strict liability.